Jeannette Martello, M.D.
701 Fremont Avenue
South Pasadena, CA 91030
(626) 403- 1703

Eastern District of Kentucky
**FILED**

MAR - 7 2011

AT COVINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

## United States District Court for the
## Eastern District of Kentucky

Jeannette Martello, M.D.

    Plaintiff,

      vs.

Joshua Santana
David Bratt
Robert Brown
Dean Bucalos
Philip Fay
Mary Fullington Kelsay
Ann Samani
David Zorin
Santana Law Office, PSC
Joshua E. Santana, PSC
Santana & Beiting, PSC
Santana & Fay, PSC
Santana, Fay & Bratt, PSC
Brown, Santana & Bratt, PSC
Brown, Bucalos, Santana & Bratt, PSC

    Defendants

5: 11-CV-93-KKC-...

**FACTUAL BACKGROUND:**

Plaintiff Jeannette Martello, M.D. (hereinafter "Martello") lives and conducts business in California. Defendants Joshua Santana (hereinafter "Santana"); defendant law firm members David Bratt, Robert Brown, Dean Bucalos, Philip Fay, Mary Fullington Kelsay, Ann Samani, Joshua Santana and David Zorin (hereinafter "law firm members") live in and/or conduct business in Kentucky. Santana Law Office, PSC; Joshua E. Santana, PSC; Santana & Beiting, PSC; Santana & Fay, PSC; Santana, Fay & Bratt, PSC; Brown, Santana & Bratt, PSC; Brown, Bucalos, Santana & Bratt, P.S.C. (hereinafter "the law firm") presently conduct business in Kentucky and/or conducted business in Kentucky in the past. These law firms have all been registered with the Kentucky Secretary of State of Kentucky now or in the past. The Santana Law Office, P.S.C. is presently registered with the Kentucky Secretary of State of Kentucky. Liquidated, compensatory damages total over $ 75,000.

In 1991, Martello lived in Kentucky and entered into a confidential, fiduciary attorney-client relationship with defendants Santana and the law firm. This fiduciary relationship was based on trust, reliance and confidence. The attorney-client relationship that existed between Martello and Santana and the law firm continued for well over a decade, many years after Martello moved back to her native southern California in 1999. For many years, Martello relied upon, acted upon and trusted the legal advice and representation given to her by attorney confidante Santana and the law firm. Santana and the law firm represented her as her attorney with several legal matters involving various entities, including, but not limited to, the University of Kentucky, the University of Kentucky Medical Center and The Sterling Group, to name a few. The close, confidential attorney-client relationship Martello had with Santana was much more than that. Martello trusted and confided in Santana as if he were an uncle or father figure. In fact, Santana's wife, Laura, advised Martello on personal matters over the phone and in person at Martello's house.[1]

---

[1]  During a portion of their attorney/client relationship, between 1991 and 1996, Martello lived and worked in Lexington pursuing a competitive surgery residency training program at the University of Kentucky Medical Center. Between July 1, 1997 to June 30, 1998, Martello lived in Louisville in order to complete a rigorous year-long hand fellowship. After the fellowship's completion, Martello lived in Louisville and worked in emergency rooms throughout Kentucky until returning to her home state of California to set up practice in January of 1999.

1    In 1991, during her free time, Martello began to review potential medical malpractice cases for

2  Santana and the law firm as a medical legal consultant.  None of these cases involved the

3  University of Kentucky Medical Center or Veterans Administration Medical Center since a

4  conflict of interest would have existed.[2]  This medical legal consulting work included the

5  acquisition of pertinent medical records; the initial medical record review; the formulation of an

6  unbiased opinion regarding whether or not medical negligence existed; the identification of

7  possible defendants; extensive medical literature research; lawyer education regarding the

8  medical aspects of the cases and the acquisition of expert witnesses (in a variety of fields) who

9  would agree to be deposed or testify during trial if they agreed that the case did or did not have

10  merit with respect to medical malpractice allegations.  For the majority of the medical legal

11  consultant work that Martello performed for Santana and the law firm while she lived in

12  Kentucky and then later when she moved back to California in 1999, Martello was paid at a

13  predetermined hourly rate as an independent contractor.  The hourly rate reimbursement was the

14  way that Martello conducted her business with Santana and the law firm except for in the three

15  given instant cases of contingency fee arrangements in the H.S., D.D. and T.M. cases.[3]

16    In 1993, Martello was one of the treating physicians who treated a toddler who became

17  irreversibly brain damaged after a twenty minute minor surgery performed at an outlying facility.

18  H.S.'s mother asked Martello why and how this could have happened to her precious daughter.

19  As a patient advocate, Martello felt compelled to help this injured patient and her family find out

20  the answers to the questions of why this had happened to their little girl, H.S.  After obtaining

21  permission from H.S.'s mother to talk about her daughter's situation to Santana, Martello called

22  him at the law firm.  Since Martello implicitly trusted in and relied on Santana's attorney

23  representation as her personal attorney, Martello thought that Santana and the law firm might be

24  able to help the family get answers.

25    Thereafter, Martello introduced Santana to the child's parents in the hospital lobby after first

26  obtaining permission from the parents.  The parents were anxious to hire a lawyer who would

27

28
[2] Since 1984, Martello had performed medical legal consulting work for many California plaintiff and defense law firms.
[3] Cases shall be referred to by initials other than the initials of the actual patients for patient confidentiality reasons.

2

1   help them get answers.  That day, after meeting the parents in the hospital lobby and before
2   being hired for legal employment, Santana proposed that he go to see the gravely ill child in the
3   hospital.  The child was critically ill, intubated with a breathing tube in place, on the respirator
4   and in the pediatric intensive care unit.  Martello informed Santana that only family members
5   were allowed to visit the patient.  Martello didn't think that it was appropriate for Santana to visit
6   the child and took no part in it.  After being apprised of the fact that visitors were restricted,
7   Santana announced to the parents, "Well, I am sure that they will let the family minister visit
8   her."  Martello did not feel comfortable with this whole charade.  Additionally, the child's
9   parents seemed to be surprised with this suggestion as well, but they allowed Santana to visit
10  their child who was unconscious in the pediatric intensive care unit.  As part of his "role" as
11  family minister, Santana put on quite a production and theatrically portrayed that he was the
12  family minister by loudly leading the parents and other family members in prayer, with hands
13  joined amongst them over the child.  A few days later, the child was removed from the life
14  support system and died as a result of irreversible brain damage.
15      Santana suggested that they meet at his house since Martello was very busy with her work at
16  the hospital and could not get away.  Santana invited Martello over to his house to discuss the
17  possibility of working together towards obtaining answers through legal representation of the
18  H.S. family.
19      Santana's wife, Laura, was at home.  After pleasantries were exchanged, Martello and Santana
20  went up to his second floor home office to discuss the medical details of the H.S. matter.
21  Martello then asked Santana if there was any other working arrangement that they could enter
22  into besides that of an hourly rate reimbursement.  After all, but for her introducing Santana to
23  the family, Santana would never have met them.  Martello was going to put more time into this
24  case than she had devoted to other matters she had worked on for Santana and the law firm.  In
25  response to Martello's query, Santana responded that Martello could get a percentage of the
26  attorney fees that he and the law firm recovered in the H.S. case.  Santana also stated that
27  Martello could receive a percentage of the attorney fees Santana and the law firm recovered in
28

3

1   future cases if she introduced Santana to the patient and/or family and performed medical legal

2   consultant work for the case on a deferred compensation, contingency basis.

3      Right then and there, in Santana's own handwriting, he wrote out the following global contract

4   that would cover these specific contingency cases. On thermal fax paper, he wrote "If settled

5   before trial your fee would be 20% of *my* fee (33 1/3). If settled after lawsuit is filed your fee

6   25% of *my* fee (40%). In return you would provide T/A and assist in obtaining expert. *We*

7   *would reimburse your actual expenses.*" Santana then initialed this document. **(emphasis**

8   **added).**

9      Subsequent to the child's demise, Santana sent a two page typewritten contract dated July 22,

10  1993 to Martello. This typewritten contract was typed by a law firm employee and on the

11  letterhead for the law firm of Brown, Bucalos, Santana and Bratt, P.S.C. Joshua E. Santana

12  signed on behalf of the law firm that was typed just above his signature. In this typewritten

13  contract, the details regarding Santana's handwritten contract were further fleshed out. The

14  subject matter for the typewritten contract was listed as "Re: Professional services relative to a

15  potential medical malpractice action regarding . . ."; the deceased child's name followed. The

16  typewritten contract read, *"[T]his letter is to confirm our recent conversations* regarding your

17  involvement relative to the referenced matter . . .[y]ou will have primary responsibility for

18  identifying potential testifying doctors and *assisting this firm* with the technical aspects of the

19  case." "In return for your assistance *we* have agreed you will be entitled to *twenty percent (20%)*

20  *of any fee received by this firm* if the matter is settled prior to the filing of a lawsuit. In other

21  words, should the matter be settled prior to the filing of a lawsuit, and should the fee *collected by*

22  *this firm* be $ 100,000, your fee would be $ 20,000.00. Should the matter be settled following

23  the filing of a lawsuit, *your fee would be twenty-five percent (25%) of any fee received by this*

24  *firm.* In other words, should the matter be settled or tried subsequent to the filing of a lawsuit,

25  and should the fee *collected by this firm* be $ 100,000, your fee would be $ 25,000.00. In

26  addition to the above, *we will reimburse you* your out-of-pocket expenses in procuring an expert.

27  In addition to the above, *Brown, Bucalos, Santana & Bratt, P.S.C. will reimburse you* your out-

28  of-pocket expenses in procuring an expert. Please indicate your concurrence with this

4

1 arrangement by signing below and returning the signed document to me in the enclosed self-

2 addressed envelope. I have included a signed original for your files." **(Emphasis added).**

3     Martello detrimentally and reasonably relied upon both Santana's handwritten contract and the

4 typewritten contract dated July 22, 1993 and performed her duties as outlined in the contract for

5 the H.S case on a deferred compensation, contingency basis. For several years, Martello

6 simultaneously continued to review other cases for Santana and the law firm on an hourly basis.

7     In 1996, Martello was one of the treating physicians who was taking care of a young man who

8 underwent the surgical removal of the majority of the dead lower leg musculature. D.D.'s

9 mother asked Martello why her son's muscle was dead and if there could have been anything to

10 prevent the muscle from dying. Mrs. D and the patient D.D. wanted answers that Martello could

11 not provide to them. After asking permission of the patient D.D. and his mother Mrs. D,

12 Martello called Santana at the law firm. Since Santana was Martello's attorney and had been her

13 attorney for many years, she trusted in him implicitly. She also trusted in Santana and the law

14 firm since they were already working on obtaining answers to the questions that H.S.'s parents

15 had had regarding her medical situation. Martello told Santana that she would like to introduce

16 him to a mother and son, Mrs. D and D.D. who wanted answers to questions regarding D.D.'s

17 medical situation. Martello verbally verified with Santana that they would have a similar

18 contingency fee relationship that they had with the previous H.S. case, but that she wanted an

19 increase in the percentages of recovery since this would involve even more work than the H.S.

20 case. Martello knew that she would have to perform hours of work in order to find out what had

21 had happened to D.D. Santana told her that he would increase her fees from the previous 20%

22 and 25% to a new percentage recovery of 25% and 33 1/3% based on the recovery of the

23 attorney fees that Santana and the law firm recovered in the D.D. matter. If a lawsuit had to be

24 filed before the case was settled, Martello would receive 33 1/3% of the attorney fees recovered

25 by Santana and the law firm. Martello agreed to work for Santana as a non-testifying expert on

26 this D.D. case on the modified contingency fee basis. Martello introduced Santana to D.D. and

27 Mrs. D. Santana contracted with D.D. and his mother Mrs. D. for legal representation.

28

On July 1, 1996, Joshua Santana sent a typewritten contract to Martello on the letterhead of the law firm Brown, Bucalos, Santana & Bratt PSC. The typewritten contract was typed by a law firm employee. Above Joshua E. Santana's signature, the law firm of Brown, Bucalos, Santana & Bratt PSC was listed. The subject matter was listed as the young man's name. The typewritten contract outlined the following, "I want to thank you for your assistance and efforts to date regarding this matter. The purpose of this letter is to **document our verbal arrangements regarding your fee for services.** This will confirm that *we* have hired you to assist in the preparation and trial regarding the referenced matter. In addition to **working with us** on the medical/legal issues, you will also assist in obtaining expert witnesses and medical records review. Your fee for these services . . . **will equal 25% of the net fee recovered by this firm** if the matter is settled before trial; and **33.3% of the net fee recovered by this firm** if the matter results in a trial and jury verdict. Please indicate your agreement with this arrangement by signing the bottom of this letter where indicated and returning it to me." As noted, Santana increased the fee in this July 1, 1996 typewritten contract that Martello would be paid from 20% of the net fee recovered by the firm to 25% of the net fee recovered by the firm if the case settled before trial. Additionally, Santana increased the fee in this July 1, 1996 typewritten contract that Martello would be paid from 25% of the net fee recovered by the firm to 33 1/3% of the net fee recovered by the firm if the case resulted in a trial and jury verdict." Any future deferred compensation, contingency fee arrangements between Martello and Santana and the law firm were to be handled on this increased percentage basis of 25% (before lawsuit filed or before trial) and 33 1/3% (after lawsuit filed or after trial and jury verdict).

Martello relied upon this typewritten contract and started to work as a medical legal consultant and educator on the D.D. case for Santana and the law firm on a deferred compensation, contingency fee basis.

On June 17, 1997 Santana wrote to Martello on letterhead for the law firm of Brown, Santana & Bratt, PSC regarding the settlement of the H.S. case. The subject matter was the names of the parents of the deceased child. The letter read, "Enclosed is check # 0196 in the amount of $ 36,150.56. This check represents payment regarding your assistance in the . . . case. As I

6

1   indicated during our recent conversation, there were additional costs incurred in representing the

2   plaintiffs totaling $ 15,397.75. These costs were deducted before the attorney fee for this case

3   was computed. Your share of those costs was $ 3849.44. These costs were related to a number

4   of collateral matters that were encountered during the course of this litigation which required

5   additional representation of [Ms. H . . .] Thank you for your valuable assistance and welcome

6   back to Kentucky. I look forward to seeing you in the near future." Martello was paid 25% of

7   the $ 160,000 attorney fees recovered minus the costs of $ 3849.44, which was represented as

8   her portion of the costs to be responsible for.

9       The final case that Martello and Santana entered into on a contingency fee basis was that of

10   T.M., a teenager who underwent an arm amputation. It was August of 1997[4] and Martello was

11   working in Louisville as a hand surgery fellow. Martello was one of the treating physicians who

12   was taking care of T.M. She accompanied him to whirlpool and tried to hide the silent tears that

13   she cried when she saw the pain that T.M. was feeling from the raw, exposed nerve endings.

14   Mrs. M felt helpless and tried to comfort her son during these sessions. Mrs. M asked Martello

15   why her son had had to undergo an arm amputation and how this could have been prevented.

16   Martello did not feel that she was in a position to answer these questions for the mother since she

17   did not know the totality of the medical details regarding T.M.'s case. Martello told the mother

18   that she could talk to her own personal attorney Santana about the situation and that maybe he

19   could find out the answers to her questions. Mrs. M gave permission for Martello to present her

20   minor son's case to Santana.

21       Prior to introducing Mrs. M to Santana and after obtaining permission from Mrs. M, Martello

22   called Santana and explained the situation to him. Santana was anxious to visit the patient and

23   his mother whose identities he did not know. Santana offered to drive up from Lexington to

24   Louisville to meet with the minor son and his mother. Martello did not give Santana the

25   patient's name and location until she verified that they would enter into a contingency fee

26   relationship in the Mrs. M/T.M. case (hereinafter "T.M. case")[5]. Martello told Santana that she

27

28   [4] Exact dates and names can be provided, but are not provided here to protect the patient's confidentiality.
     [5] Since T.M. was a minor, Martello knew that Mrs. M would also be a party to the case. She had learned this with the H.S. case that she had
     worked on for Santana and the law firm.

7

1   desired for the T.M. case to be that of a deferred compensation, contingency fee basis since, after
2   all, she was going to introduce Santana to the mother and son.  Santana stated that if Martello
3   introduced Santana to T.M. and his mother Mrs. M, that he and the law firm would hire Martello
4   to assist Santana and the law firm on medical legal issues, obtain expert witnesses, perform
5   medical records review and medical legal consultant work, basically that Martello would assist
6   Santana and the law firm in finding out answers to the client's questions regarding his previous
7   medical treatment.  Martello's fee for the services would be contingent on the attorney fees
8   collected by Santana and the law firm.  Martello's recovery would equal 25% of the fees
9   recovered by Santana and the law firm if the matter settled before trial and 33 1/3% of the fees
10  recovered by Santana and the law firm if the case resulted in a trial and jury verdict.
11     Martello preferred to have a written contract with Santana and told him so.  He said that he
12  would write one up like he had done so in the past with the H.S. and D.D. cases.  Santana
13  verbally assured Martello that he "would take care of her."  "[D]on't worry.  After all, haven't I
14  always taken care of you?  Trust me."  Since Martello believed in and trusted her attorney
15  Santana, she gave Mrs. M Santana's phone number and Mrs. M then called Santana.  Santana
16  drove up from Lexington to Louisville to meet Mrs. M and the patient T.M in the hospital.
17  When Santana went to visit the patient in the hospital, the patient was stable and had been
18  receiving many visitors.
19     Martello performed her end of the deal and spent many hours on the three deferred
20  compensation, contingency fee cases of H.S., D.D. and T.M.  Martello detrimentally and
21  reasonably relied that she would be paid fees due to her as a result of entering into the written
22  and oral contracts with Santana and the law firm.
23     On December 3, 1998, Martello received a check from Santana and the law firm in the amount
24  of $ 17,600 towards her fee for work on the T.M. case.  At this time, she was still living in
25  Louisville.  When she received the check, Martello asked Santana how much the case had settled
26  for and how much the attorney fees were that he and his firm had received.  Santana told
27  Martello that there was a "gag order" and that he could not tell her how much the T.M. case had
28  settled for.  He told her, "[D]on't worry.  I took care of you."

8

1    On August 5, 1999, Martello was living in South Pasadena, California. On that date, she

2    received via U.S. mail a check in the amount of $ 5,000 from Santana and the law firm for

3    payment in the D.D. case. When she received the check for $ 5,000, Martello called Santana and

4    asked him how much the case had settled for and how much the attorney fees were that he and

5    his firm had received. Just like he had done with the T.M. case, Santana told Martello that there

6    was a "gag order" and that he could not tell her how much the D.D. case had settled for, but

7    "[T]here was no need to worry, because I have taken care of you, just like I always have."

8    Finally, as a result of another settlement in the T.M. case, Martello received a check from

9    Santana and the law firm in the amount of $10,000 on August 11, 2000. When Martello received

10   the check for $ 10,000, Martello called Santana and asked him how much the case had settled for

11   and how much the attorney fees were that he and his firm had received. Just like he had done so

12   with the prior T.M. settlement and with the D.D. case, Santana told Martello that there was

13   another "gag order" and that he could not tell her how much the second settlement for the T.M.

14   case had settled for, but "[T]here is no need to worry, because I took care of you."

15   In fact, Martello trusted in and relied upon the legal advice of Santana and his law firm so

16   much that when she was organizing a treatise on Medical Legal Issues in Plastic Surgery, she

17   asked Joshua Santana and Philip Fay to write book chapters for this Clinics in Plastic Surgery

18   volume. Santana and Fay agreed to write book chapters, but were never able to meet the

19   publishing deadlines. Other authors ultimately wrote the chapters that had been assigned to

20   them. This volume was published in January of 1999.

21   Martello moved from Louisville back to native southern California in January of 1999 and

22   opened up a surgical practice in Pasadena, California. Martello maintained her confidential,

23   fiduciary, attorney-client relationship with Santana and the law firm for many years thereafter.

24   In fact, just before returning to southern California, Martello asked legal advice of Santana over

25   the phone regarding a professional matter. On another occasion, Martello drove down to meet

26   with one of the lawyers in Santana's law firm to whom Santana referred her. While living in

27   southern California after 1999, Martello called and asked legal advice of Santana regarding other

28   various professional matters. Another time, Martello flew out to Louisville to meet with a family

9

1   regarding a potential wrongful death lawsuit in 2000. After meeting with the family, Martello

2   called Santana and drove down to Lexington to meet with one of the lawyers from Santana's law

3   firm to discuss the matter. Martello went to Santana's law firm, exchanged pleasantries with

4   Santana and met with the junior attorney for coffee at an outside coffee establishment to discuss

5   the potential case. For many years, Martello continued to review potential medical malpractice

6   cases for Santana and his law firms on an hourly basis. No further cases were entered into on a

7   contingency basis other than those of the H.S., D.D. and T.M. cases.

8       In 2005, Martello became involved with medical publishing and thought that it would be a

9   good idea to interview some of the patients she had cared for, with their permission of course.

10  Martello was thinking about writing a piece on medical adversity and overcoming it. One day in

11  the end of May 2005, Martello decided to see if she could locate T.M., the young man who had

12  undergone an arm amputation. In order to locate T.M., Martello paid for several skip trace

13  reports in order to find him.[6] Martello called several distant relatives of T.M. prior to being able

14  to finally locate T.M.'s residence. Martello called T.M.'s residence and spoke with his mother

15  and grandmother before finally being able to personally talk to T.M. During this telephone

16  conversation with T.M., she learned that he was now a member of a musical group. During the

17  interview with T.M., Martello asked T.M. how much his medical malpractice case had settled for

18  since she had been such an integral part of the case. The young man told Martello that he

19  thought that the case had settled for about $ 1.75 million dollars. Martello was taken aback at the

20  amount of the settlement that T.M. had just revealed to her. Martello then asked T.M. if he had

21  any idea how much Santana (the lawyer whom she had introduced him to) and the law firm had

22  received as part of the lawsuit. T.M. stated that he thought that the lawyers received about

23  $ 700,000. Martello asked if more lawyers than Santana and his law firm were involved in

24  T.M.'s medical malpractice settlement. T.M. said that there were a few lawyers involved.

25  Martello asked T.M. if he had any papers that could show the amount of the settlement and

26  attorney fees recovered by the lawyers in his case. T.M. said that he didn't think that he had any

27

28

---

[6] Martello had recently become aware of skip trace services as part of working on a magazine.

1  paperwork, but that he would look into it and call her back.  Martello never heard back from

2  T.M.

3      After T.M. told her about the $ 700,000 that the lawyers received, Martello wondered whether

4  or not Santana and the law firm had defrauded her, but there were several unanswered questions.

5  Martello did not know how many other lawyers T.M. had had involved with his case and

6  settlement since both the defendant physician and defendant hospital were located outside of the

7  state of Kentucky.  Martello did not know how much in attorney fees Santana and the law firm

8  had recovered in the T.M. case since Santana had never disclosed the information to Martello.

9  Santana had told her that the amount of attorney fees recovered by Santana and the law firm

10  were protected by a "gag order" and that he could not disclose this amount to Martello.

11      The same day that Martello finally had an opportunity to talk to T.M., Martello decided to try

12  to find D.D. since he was the only other patient who Santana had stated that a "gag order"

13  controlled the fact that he could not disclose the attorney fees that Santana and the law firm had

14  recovered.  Again, Martello had to pay out for skip trace services to find D.D.  Once she finally

15  got D.D. on the phone and asked him how he was doing, she asked D.D. how much money he

16  thought the malpractice settlement had been for.  D.D. told Martello that he thought that the

17  amount of the settlement was $ 170,000.  Martello then asked how much Santana and the law

18  firm had received as part of their attorney fees.  D.D. stated that he thought that Santana had

19  received about $ 70,000.  Martello was surprised at the amount of money that was revealed since

20  she had received $ 5,000 as payment in full towards work completed for the D.D. case.  If what

21  D.D. was telling her was right and if Santana and the law firm were the only lawyers who

22  represented D.D. in this case, Martello was due to receive at least $ 17,500 (25% of the $ 70,000

23  attorney fees recovered if it was settled before trial) or $ 23,333.33 (33 1/3% of the $ 70,000

24  attorney fees recovered if it was settled after trial).  After all, her recovery was dictated by the

25  typewritten contract that Martello and Santana had entered into dated July 1, 1996.

26      Within less than 3 days after finding out this information from T.M. and D.D., Martello hired

27  California attorney Mr. Brandon Tesser (hereinafter "Tesser") to find out if Martello had been

28  defrauded by Santana and the law firm.  Tesser was hired to help Martello discover the attorney

11

1   fees recovered for both the T.M. and D.D. cases since the amount of Martello's recovery was

2   dependent on the attorney fees recovered by Santana and the law firm.  Martello also hired

3   Tesser to find out whether or not she had received the proper amount of money for the H.S. case,

4   the first contingency fee case that Santana/the law firm and Martello had entered into. Tesser had

5   represented Martello on various intellectual property matters and she trusted him to find out the

6   material attorney fee information that had been concealed and never disclosed to her by Santana

7   and the law firm.  Prior to this, Martello had no reason to doubt the word of Santana or the law

8   firm, but she wanted to ascertain and obtain the knowledge about whether or not she had been

9   defrauded.

10      Tesser contacted Santana regarding this matter and sent a letter to Santana dated June 6, 2005.

11   In response to Tesser's letter, Santana hired an attorney, Mr. Benjamin Cowgill (hereinafter

12   "Cowgill").   Even though Tesser represented Martello, Santana continued to conceal the amount

13   of attorney fees that he and the law firm recovered in both the T.M. and D.D. cases.  Santana

14   obstructed Martello from ascertaining whether or not she had a cause of action.  Martello did not

15   want to initiate a cause of action based on hearsay from T.M. and D.D.  Since T.M. had never

16   called Martello back, Martello was afraid that T.M. would never testify to the amount of the

17   attorney fees recovered by Santana and the law firm (the amounts that T.M. had disclosed to her

18   over the phone).  Also, T.M. had told Martello that he had many lawyers and Martello needed to

19   find out exactly how much in attorney fees were recovered specifically by Santana and the law

20   firm.

21      Tesser, a California attorney unfamiliar with Kentucky law, suggested that the parties enter

22   into a tolling agreement regarding the statute of limitations.  A tolling agreement was revised by

23   Santana and his attorney Cowgill.  Both Santana and Martello signed the tolling agreement.  The

24   tolling agreement read, "The tolling Period shall be that period of time which began on June 1,

25   2005 and which shall end thirty (30) days after either of the Parties gives written notice to the

26   other that the Tolling Period has terminated, provided, however, that the Tolling Period shall

27   terminate automatically on April 1, 2006 unless extended by a written agreement signed by the

28

1   Parties prior to April 1, 2006." Both parties signed this tolling agreement. Neither party gave

2   written notice of termination. The tolling agreement was not extended beyond April 1, 2006.

3       On March 2, 2006, Tesser wrote to Cowgill and asked for documentation regarding fee

4   agreements and the settlement amounts. This confidential information was faxed to Tesser's

5   office on Friday afternoon, March 3, 2006 by Santana's attorney Cowgill after it had been faxed

6   to Cowgill by Santana on March 3, 2006. On Tuesday, March 7, 2006, Martello discovered the

7   fraud that had been perpetrated on her by her attorney and confidante Santana and the law firm

8   when Tesser disclosed to her the confidential information he had received regarding the attorney

9   fees recovered in the D.D. and T.M. cases. Although the information contained within those

10  confidential documents can not be divulged in this complaint for reasons that Martello can not

11  even allude to, suffice it to say that this confidential information will be obtained through

12  subpoenas and the discovery process as dictated by law.

13      Of note, during the discussions that took place during this tolled period of time June 1, 2005

14  through April 1, 2006, Santana threatened to tell the University of Kentucky on Martello. This

15  direct threat was communicated to Martello by her attorney Tesser. This was an obvious verbal

16  threat to besmirch Martello's reputation with the University of Kentucky, a place that she had

17  completed both surgery training.

18  **DEFENDANTS ABSCONDED, CONCEALED AND OBSTRUCTED MARTELLO'S**
19  **CAUSE OF ACTION AS CODIFIED IN KRS 413.190(2).**

20      According to Kentucky Revised Statutes 413. 190(2), "When a cause of action mentioned in

21  KRS 413.090 to 413.160 accrues against a resident of this state, and he by absconding or

22  concealing himself or by any other indirect means obstructs the prosecution of the action, the

23  time of the continuance of the absence from the state or obstruction shall not be computed as any

24  part of the period within which the action shall be commenced." *Rigazio v. Archdioceses of*

25  *Louisville, Ky. App., 853 S.W.2d 295, 297 (1993), quoting Adams v. Ison, Ky., 249 S.W.2d 791,*

26  *792 (1952). Rockwell v. Wilhite, Ky. App., 143 S.W.3d 604 (2004). Landrum v. Ridge and Board*

27  *of Regents, 1997-CA-002793-MR.* "For purposes of applying KRS 413.190(2), "obstruction" is

28  defined as any "act or conduct which in point of fact misleads or deceives plaintiff and obstructs

13

1   or prevents him from instituting his suit while he may do so." *Landrum v. Ridge and Board of*

2   *Regents, 1997-CA-002793-MR.*

3     Defendants should be equitably estopped from asserting any statute of limitations defense since

4   this is a "judicial remedy by which a party may be precluded by [the party's] own act or

5   omission rom asserting a right to which [the party] otherwise would have been entitled."

6   *28 Am. Jur. 2d Estoppel and Waiver Section 28 (2000).*

7     Santana, the law firm and the law firm members absconded and concealed the material terms

8   of the contracts that were available only to them, namely the attorney fees recovered in the

9   T.M. and D.D. cases.  Furthermore, the practice that attorney fees are taken off of the top of a

10   settlement prior to dealing with costs was a practice that only Santana, the law firm and law firm

11   members knew and did not disclose to Martello.  Martello had costs in the amount of $3849.44

12   deducted from her recovery check for the H.S. case.  By doing so, defendants obstructed the

13   prosecution of the action on Martello's part.  As such, defendants should not be able to hide

14   behind any statute of limitations defense.  Martello only discovered the fraud and acquired actual

15   knowledge of the fraud when Tesser disclosed the contents of the confidential information to her

16   on March 7, 2006.

**BREACH OF FIDUCIARY DUTY**

17

18     "A fiduciary relationship 'is one founded on trust and confidence reposed by one person in the

19   integrity and fidelity of another and which also necessarily involves an undertaking in which a

20   duty is created in one person to act primarily for another's benefit in matters connected with such

21   undertaking." *Morton v. Bank of The Bluegrass and Trust 18 S.W.3d 353 (1999).*  This fiduciary

22   relationship is "founded on the trust and confidence reposed by one person in the integrity and

23   fidelity of another." *Steelvest, Inc. v. Scansteel Service Ctr., Inc., Ky., 807 S.W. 2d 476 (1991).*

24     "[S]ome special relationships by their nature automatically trigger an independent duty of care

25   that supports a tort action even when the parties have entered into a contractual relationship."

26   "In these situations where we have recognized the existence of a duty *independent* of any

27   contractual obligations . . . the claim is based on a recognized independent duty of care." *Town*

28   *of Alma, 1 P.3d at 1262-1263 (quoting Tommy L. Griffin Plumbing & Heating Co. v. Jordan,*

14

1   *Jones & Goulding, Inc., 463 S.E.2d 85, 88 (S.C. 1995)(emphasis added).  Presnell Const.*

2   *Managers v. EH Const. 134 S.W.3d 575 (2004).*

3     "The relationship of attorney-client is a contractual one, either expressed or implied by the

4   conduct of the parties.  The relationship is generally that of principal and agent; however the

5   attorney is vested with powers superior to those of any ordinary agent because of the attorney's

6   quasi-judicial status as an officer of the court; thus the attorney is responsible for the

7   administration of justice in the public interest, a higher duty than any ordinary agent owes his

8   principal.  Since the relationship of attorney-client is one fiduciary in nature, the attorney has the

9   duty to exercise in all his relationships with this client-principal **most scrupulous honor,**

10   **good faith and fidelity in his client's interest.**  *Goodman v. Goldberg & SimpsonP.S.C., 323*

11   *S.W.3d 740 (2009).  Daugherty v. Runner, 581 S.W.2d 12 (1978). Faris v. Stone, 103 S.W.3d 1*

12   *(2003).*  **(emphasis added)**

13     "We would presume to place the breach of fiduciary relationship on an equal par with fraud

14   and deceit.  Accordingly, we determine, as a matter of law, that a breach of a fiduciary duty is

15   equivalent to fraud." *See, Henkin, Inc. v. Berea Bank and Trust Co., Ky.App., 566 S.W.2d 420*

16   *(1978). See, also, generally,* 36A C.J.S., *Fiduciary.  Lach v. Man O'War, LLC 256 S.W. 3d 563*

17   *at 572 (2008).*

18     The existence of this fiduciary attorney-client relationship required Santana and the law firm to

19   "disclose all relevant facts and advise" Martello so as to "further her interests."  Any

20   representations made by Santana to Martello regarding the gag order controlling the attorney fees

21   collected in the T.M. and D.D. cases (and that what Santana and the law firm paid her in the

22   cases was all that she was due to receive) were not only ones on which Martello would be

23   expected to rely, but were undoubtedly made to induce her to inaction.

24     Martello had an attorney-client relationship with Santana and the law firm for many years

25   which began in 1991 and lasted for well over a decade.  This fiduciary duty was breached by

26   both Santana and the law firm.  In accordance with this attorney-client fiduciary relationship,

27   Santana and the law firm were obligated to act with the most scrupulous honor, good faith and

28   fidelity in client Martello's interest.  Santana and the law firm could have correctly computed

1   and paid her the fees due in T.M. and D.D. cases without defrauding her of money or

2   disclosing the amount of the settlement in each case.  Santana and the law firm had a duty to

3   disclose the amount of the attorney fees that they recovered in both the T.M. and D.D. cases

4   since this was a material term of the contracts and since Martello's recovery was dependent on

5   this material term.  Additionally, the attorney fees collected in the T.M. and D.D. cases were not

6   protected by attorney-client confidentiality since Santana had disclosed the exact amount of

7   money he and his firm had recovered in the H.S. case as well as the amount of the settlement.

8   Nevertheless, Santana and the law firm decided to defraud Martello of $3849.44 in "costs" even

9   though that had never been part of the typewritten H.S. contract  Santana and the law firm

10  fraudulently misrepresented that "that is the way things are done" in order to deduct the costs

11  from Martello's recovery in the H.S. case.

12      Santana and the law firm breached the fiduciary, attorney-client duty that they had with

13  Martello and thus are guilty of fraud.

14

15  **COMMON LAW FRAUD**

16      "A party claiming fraud must establish six elements by clear and convincing evidence: (1)

17  material representation; (2) which is false; (3) known to be false or made recklessly; (4) made

18  with inducement to be acted upon; (5) acted in reliance thereon and, (6) which causes injury."

19  *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc., Ky. App., 113 S.W.3d 636, 639 (2003) citing*

20  *United Parcel Service Co. v. Rickert, 996 S.W.2d 464, 468 (Ky. 1999); Farmers Bank and Trust*

21  *v. Willmott Hardwoods, 171 S.W.3d 4 (2005). Branch Banking v. Thompson, Smith v. Watson,*

22  *1997-CA-003104-MR citing Wahba v. Don Corlett Motors, Inc., 573 S.W.2d 357, 359 (Ky.*

23  *App.1978). Commonwealth of Kentucky Court of Appeals, no. 2009-CA-001427-MR.*

24      The Kentucky Court of Appeals has noted that "fraud may be established by evidence which is

25  wholly circumstantial.  The courts of this Commonwealth have long recognized that '[p]arties

26  contemplating the commission of fraud do not usually blow a horn or beat a drum to call

27  attention to what they are doing,' and have accordingly held that frauds may be established by

28  circumstances . . .the combination of all the circumstances considered together may be decisive

16

1   in a given case of fraudulent design." *Johnson v. Cormney, Ky., App., 596 S.W.2d 23, 27, (1990)*

2   *citing Bolling v. Ford, 213 Ky. 403, 281 S.W. 178 (1926).  United Parcel Service Co. v. Rickert,*

3   *996 S.W.2d 464, 468 (Ky. 1999) citing Grant v. Wrona, Ky. App., 662 S.W.2d 227, 229 (1983).*

4   Furthermore, "[f]raud may be committed by intentionally asserting false information or by

5   willfully failing to disclose the truth. " *Chamberlain v. National Life & Accident Ins. Co., Ky.,*

6   *76 s.W.2d 628, 631 (1934).  See also Restatement (Second) of Torts Section 529 (1977)*, which

7   indicates that stating a mere partial truth can be fraudulent if it is materially misleading." *United*

8   *Parcel Service Co. v. Rickert, 996 S.W.2d 464, 468 (Ky. 1999)*

9   "A claimant may establish a detrimental reliance in a fraud action when he acts or fails to act

10  due to fraudulent misrepresentations."  *United Parcel Service Co. v. Rickert, 996 S.W.2d 464,*

11  *468 (Ky. 1999) citing Sanford Construction Co., v. S & H Contractors, Inc., Ky., 443 S.W. 2d*

12  *227, 232 (1969).*  "A person is entitled to damages resulting from inaction when an untrue

13  statement is made with the intent to induce that person to refrain from acting so long as it can be

14  demonstrated that the false statement produced the inaction." *United Parcel Service Co. v.*

15  *Rickert, 996 S.W.2d 464, 468 (Ky. 1999) citing 37 Am.Jur.2d Fraud and Deceit, Section 225*

16  *(1969).*

17  Furthermore, detrimental reliance may be established by circumstantial evidence. "The very

18  essence of actionable fraud or deceit is the belief in and reliance upon the statements of the party

19  who seeks to perpetrate the fraud.  Where the plaintiff does not believe the statements---or where

20  he has knowledge to the contrary---recovery is denied. *Wilson v. Henry, 340 S.W.2d 449, 451*

21  *(Ky. 1960).  Yeager v. McLellan, 177 S.W.3d 807 (2005)*

22  ***Applying these six elements of fraud to the case at hand:***

23

24  **Element number 1**: Santana and the law firm made material representations by stating that

25  a "gag order" had been issued in the D.D. and T.M. cases and that Santana therefore could not

26  reveal the amount of attorney fees recovered in each case.  This was a material representation

27  since Martello's recovery was dependent on the amount of attorney fees recovered by Santana

28  and the law firm.  Martello's recovery was not dependent on the amount of the settlement

recovery in the cases. Furthermore, Santana and the law firm that falsely represented that Martello had to assume a portion of her costs in the H.S. case.

**Element number 2**: these material representations were false. The settlement agreements in the D.D. and T.M. cases may be found to be confidential through further discovery, but the amount of the attorney fees recovered in each case was not confidential and should have been disclosed to Martello. In the H.S. case, attorney fees are to be taken from the top of the settlement and Martello should not have had to have assumed financial responsibility for a portion of the costs since a) apparently, this is not the general legal practice of doing so and b) this was not part of the written H.S. contract.

**Element number 3**: Santana knew that these material representations were false when he Santana and the law firm made them since defendants could have disclosed the amount of the attorney fees recovered without disclosing the settlement amounts in the D.D. and T.M. cases. Additionally, Santana and the law firm knew that Martello should not have had to assume a portion of the "costs" for the H.S. case.

**Element number 4**: these false material representations were made by Santana and the law firm with the inducement for Martello to be lulled into inaction in the D.D., T.M. and H.S. cases. This inaction would prevent Martello from demanding the money due her for these contingency fee cases. Additionally, these false material representations induced Martello to continue to review medical legal cases for Santana and the law firm for years after they defrauded her (unbeknownst to her) in the D.D., T.M. and H.S. cases.

**Element number 5**: Martello trusted in and believed in Santana since he was her attorney. Martello trusted in and believed in Santana and the law firm since they had represented her in a number of legal matters. Martello detrimentally relied upon Santana's false material representations regarding the "gag orders" and Santana's inability to disclose the amount of attorney fees recovered in both the D.D. and T.M. cases. Martello detrimentally relied upon the false misrepresentation by Santana and the law firm that she was to assume financial responsibility for a portion of the costs in the H.S. case. Martello believed in and relied upon the false statements made by Santana and the law firm. Martello had no knowledge to the contrary.

18

1    Due to this detrimental reliance, Martello failed to demand the money rightly due her as

2    documented in the written and oral contracts in the D.D., T.M. and H.S. cases. These false

3    material representations induced Martello to continue to work for Santana and the law firm on

4    several cases on an hourly basis even after she returned to California in 1999. Martello

5    continued to work on cases for Santana and the law firm and even asked them to write book

6    chapters for a treatise she was working on subsequent to these false representations. Martello

7    continued to believe in and trust Santana's advice as her attorney (as well as that of the law firm)

8    and asked for legal advice with possibility of legal representation on various professional

9    matters.

10    **Element number 6**: Martello suffered actual injury as a result of her reliance on the false

11    material representations made by Santana and the law firm.

12    **SILENCE AS FRAUD**

13    Silence under circumstances entailing a legally required duty to disclose may be sufficient to

14    constitute fraud. *Faulkner Munday v. Mayfair Diagnostic Laboratory, 831 SW.2d 912, 914 (Ky.*

15    *1992).* An actionable case for fraud based upon suppression of a fact must establish (1) that the

16    defendant had a duty to disclose a material fact; (2) that the defendant failed to disclose same;

17    (3) that the defendant's failure to disclose the material fact induced the plaintiff to act, and (4)

18    that the plaintiff suffered actual damages therefrom. *Alsabi and Goldsmith v. Allstate, 2000-CA-*

19    *002970-MR.*

20    Generally, although proof of fraud requires a showing of an affirmative act by the party

21    charged, silence under circumstances entailing a legally required duty to disclose may be

22    sufficient to constitute fraud. *Munday v. Mayfair Diagnostic Laboratory, 831 SW.2d 912, 914*

23    *(Ky. 1992).* A duty to disclose may arise from a fiduciary relationship, from a partial disclosure

24    of information, or from particular circumstances such as where one party to a contract has

25    superior knowledge and is relied upon to disclose same. *See Smith v. General Motors Corp., Ky.*

26    *App., 979 S.W.2d 127,129 (1998) citing Faulkner Drilling Co., Inc. v. Gross, Ky., 943 S.W. 2d*

27    *634 (1997). Bryant v. Troutman, Ky., 287 S.W. 2d 918 (1956); Dennis v. Thomson, 240 Ky.,*

28    *727, 43 S.W. 2d 18 (1931). Willits v. Peabody Coal Company, LLC, US. App. Lexis 21096, No.*