UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON


CIVIL ACTION NO.  11-cv-93- KSF

JEANNETTE MARTELLO, M.D.,                                                    PLAINTIFF


VS.                                        OPINION & ORDER


JOSHUA SANTANA, *et al*,                                                      DEFENDANTS

\* \* \* \* \* \* \* \* \* \* \*

This matter is before the Court upon the motion filed by the Defendants, Joshua Santana,

David Bratt, Robert Brown, Philip Fay, Ann Samani, Santana Law Office, PSC, Santana and Beiting,

PSC, Santana and Fay, PSC, Santana, Fay & Bratt, PSC, Brown, Santana & Bratt, PSC, and Brown,

Bucalos, Santana & Bratt, PSC ("Defendants"), for summary judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure [DE #23].  This matter is fully briefed and ripe for review.

## I.     **Factual Background**

Plaintiff, Jeannette Martello, M.D. ("Martello"), is a medical doctor, who also has a law

degree.  Indeed, no one would dispute that Martello has an impressive academic background.

Martello attended Stanford University from 1980 to 1984, earning a B.S. and M.S. in biological

sciences [DE #23-2].  She attended U.C.L.A. Medical School from 1984 to 1988, earning an M.D.

[*Id*.].  She also attended the Boalt Hall School of Law at U.C. Berkeley from 1989 to 1991 and 1996

to 1997, earning a J.D. [*Id*.].  Although Martello has completed and passed the Multi-State

Professional Responsibility Examination (MPRE), she has been unsuccessful in her multiple

1

attempts to pass the Kentucky bar exam (as well as in her one attempt to pass the New York bar exam) and is not a licensed attorney [*Id.*].

According to Martello's verified complaint, in 1991, while a resident physician in Lexington, Kentucky, Martello began to review potential medical malpractice cases for Joshua Santana ("Santana") and his then-law firm of Brown, Bucalos, Santana & Bratt, PSC as a medical legal consultant.  Santana and his law firm had represented her as her attorneys in several legal matters, including in matters involving the University of Kentucky, the University of Kentucky Medical Center and The Sterling Group.  Her "medical legal" consulting work for Santana and his law firm was unrelated to this representation and included: acquisition and review of pertinent legal medical records; formulating opinions regarding the existence of medical negligence; identification of possible defendants; extensive medical literature research; education and consultation with the attorneys and expert witnesses regarding the medical aspects of cases; and identification of, and communication with, testifying expert witnesses.  Typically, Martello was paid at a predetermined hourly rate for her services.  However, in three cases, she claims that Santana and his firm agreed to compensate her based upon a percentage of the contingent legal fees received in those cases: (1) the Howard/Lee case; (2) the Davis case; and (3) the Tinker case.  Each of these cases will be examined in turn.

A.   The Howard/Lee Case

In 1993, Martello, then a surgery resident at the University of Kentucky Medical Center, treated a toddler who became irreversibly brain damaged after a previous surgery at another facility. After receiving permission from the child's parents to talk about their child's case with an attorney, Martello discussed the matter with Santana.  Santana then personally solicited the child's parents at

the hospital's intensive care unit, and the family retained Santana and his law firm to represent them. After the child died, Martello and Santana met at his house to discuss the possibility of working together on the legal representation of the child's family. At this meeting, Martello asked if there was any other working arrangement that they could enter into besides that of an hourly rate reimbursement. According to Martello, "[a]fter all, but for her introducing Santana to the family, Santana would never have met them" [DE #1 at p. 4]. Santana proposed that Martello could be paid a percentage of the attorneys fees that he and his law firm received in the case. According to Martello, Santana further stated that she could receive a percentage of the attorneys fees that he and his law firm recovered in future cases if she introduced Santana to the patient and/or family and performed consultant work for the case on a deferred compensation, contingency basis. Santana then wrote by hand the following outline of their agreement:

> If settled before trial your fee would be 20% of my fee (33 1/3). If settled after lawsuit is filed your fee 25% of my fee (40%). In return you would provide T/A and assist in obtaining expert. We would reimburse your actual expenses.

[DE #23-6]. Martello testified that she believed that these terms would govern every case in the future in which she introduced Santana to clients and in which there were medical damages of some sort involved.

On or around July 22, 1993, Santana sent a letter to Martello on the letterhead of Brown, Bucalos, Santana and Bratt, P.S.C., confirming Martello's compensation arrangement for her services on the Howard/Lee matter [DE #23-7]. The letter specified that, for the Howard/Lee case, Martello would provide legal/medical consulting services in exchange for 20% of the law firm's legal fee if settled prior to a lawsuit being filed or 25% of the fee if settled after the filing of a lawsuit. The letter also provided that the law firm would reimburse Martello for her out-of-pocket

3

expenses in procuring an expert witness.  The letter was signed by both Santana, on behalf of his law

firm, and Martello.

      B.    <u>The Davis Case</u>

In 1996, Martello was a treating physician for a young man who had substantial dead

musculature surgically removed from his lower leg.  The patient's mother asked Martello for

assistance in finding answers as to why her son's muscle was dead and whether anything could have

been done to prevent the muscle from dying.  After receiving permission from the patient and his

mother, Martello called Santana and told him that she would like to introduce him to the patient and

his mother.  She also told him that she wanted a larger percentage of any recovery in the case

because she anticipated that the Davis case would require more work than the Howard/Lee matter.

Santana agreed to increase Martello's fees and followed up with a letter dated July 1, 1996,

confirming that Martello would receive 25% of the net fee recovered by the firm if the matter was

settled before trial and 33.3% of the net fee recovered by the firm if the matter resulted in a trial and

jury verdict [DE #23-10].

      C.    <u>Ethics Concerns Raised Regarding Contingency Fee Arrangement</u>

Martello's compensation arrangement in the Howard/Lee case was later discussed during a

case file review at Santana's firm and was determined to be an impermissible arrangement under the

Kentucky Rules of Professional Conduct governing lawyers.  Santana testified that he discussed the

issue with Martello, who, at the time, was in the process of completing her legal studies.  In a March

31, 1997 letter, Santana wrote to Martello about the ethical concerns of the arrangement, stating as

follows:

—

> As we have discussed on several occasions, the Kentucky canons of ethics prohibit the payment of your fees for assisting in the prosecution of the [Howard/Lee] matter on a contingency basis. It is my understanding that in preparing for the ethics portion of the bar exam, this issue came up and you have reviewed the law and are in agreement with my reading of the canons. Accordingly, it is my understanding that you will be billing us on an hourly basis for work associated with this claim.

[DE #23-3].

Santana testified that, although this letter only specifically referred to the Howard/Lee case, the understanding was that the other existing percentage compensation agreements were also modified to be hourly and that he asked Martello to submit hourly invoices for the Davis case and Tinker case (discussed below), too. However, Martello argues that Santana admits that Martello did not agree - either orally or in writing - to alter the arrangement to an hourly fee for those cases in which they had already entered into a contingency fee arrangement.

D.     The Tinker Case

In August 1997, Martello was a treating physician for a child who underwent an arm amputation. The patient's mother asked Martello to help find out why her son had to undergo the amputation and how it could have been prevented. The mother gave Martello permission to present her minor son's case to an attorney. Martello called Santana and told him about her patient's case, but would not give Santana the patient's name and location until she verified that she and Santana would enter into a contingency fee relationship. Santana and Martello verbally agreed that, in exchange for her introduction of Santana to the patient and his mother and for Martello's medical legal consultant work, Martello would receive a contingency fee of 25% of the fees recovered by Santana and his firm if the matter settled before trial and 33 1/3% of the fees recovered by Santana

and his firm if the case resulted in a trial and jury verdict.  Although Martello informed Santana that she would prefer to have a written contract and Santana agreed to write one up, he failed to do so.

      E.    <u>Settlements</u>

In the Spring of 1997, the Howard/Lee case was settled for $400,000.00, with a fee of $160,000.00 paid to Santana's law firm.  In accordance with his March 31, 1997 letter, Santana asked Martello to itemize all of the time she had spent on the Howard/Lee case on an hourly basis. Santana sent Martello a copy of his law firm's time records in the case in order to assist her in "reconstructing" the four years of time she had worked on the case.  Martello claims that Santana wanted it to look like the work was done on an hourly basis, although he wanted the total charged by Martello to equal what would have been her $40,000.00 contingency fee.  Martello submitted a statement of services performed totaling 133 hours at $300.00 per hour (which was greater than her regularly hourly rate during this period of $150.00-$200.00 per hour), equaling around $40,000.00. The parties dispute whether Martello prepared her hourly itemization in the Howard/Lee case before or after she received her payment from Santana in that case.  Ultimately, Martello was paid $36,150.56 for her services in the Howard/Lee case.  The parties disagree as to the reason why the payment to Martello was reduced by $3,849.44.  Martello claims that Santana wrongfully asked her to agree to reduce her fee by her $3,849.44 *pro rata* share of so-called "additional costs," while Santana testified that additional professional services were provided to the client's family that were outside of the original contingent contract and that this rough calculation was used to reduce Martello's $40,000.00 fee after discussion with and agreement by Martello.  Regardless, Martello accepted and deposited the payment for her fees in the Howard/Lee case in June 1997.

The Davis matter was settled during the Summer of 1999. As a result of their work on the case, Santana and his firm received approximately $67,556.84 in legal fees. Thus, under the contingency fee agreement, Martello would have received $16,889.21, or 25% of the legal fee. However, Santana paid $5,000.00 to Martello for her work on the case on August 2, 1999. Santana maintains that, despite again being sent a copy of his law firm's time records to assist her in preparing her bill to the firm, Martello did not attempt to reconstruct her time and billing records on the matter. Thus, Santana claims that Martello was paid $5,000.00 as a "good faith valuation" of her services. Martello claims that, when she received the check from Santana, she called him and asked about the amount of the settlement and Santana's firm's attorneys fees. According to Martello, Santana said that there was a "gag order" in the case and he could not tell her the settlement amount, but that "there was no need to worry, because I have taken care of you, just like I always have" [DE #1].[1]

Because the Tinker case involved two separate civil actions, a negligence action arising out of the automobile accident and a separate medical malpractice action, there were also two separate lawsuit settlements. The automobile accident case settled around November 1998 and resulted in a $500,000.00 fee for Santana and his law firm. The settlement in the medical malpractice case was reached around July 2000 and resulted in an $83,333.33 fee for Santana and his law firm. Although no written contingency fee agreement existed for Martello's work on the Tinker case, Martello maintains that, under her verbal agreement with Santana, she was entitled to be paid more than

---

[1]The parties disagree whether Santana said that there was a "gag order" in this case, as well as in the Tinker case (as maintained by Martello), or whether he said that a confidentiality agreement preventing him from disclosing details regarding the settlements in those cases (as Santana claims).

$100,000.00. However, in early December 1998, Martello received a check from Santana and his firm for $17,600.00 for her services in the automobile accident case. According to Martello, upon receiving the check, she asked Santana about the settlement amount and the attorneys fees received. Santana told her that he could not tell her the settlement amount because of a "gag order," but also said, "Don't worry. I took care of you" [DE #1]. On or around August 11, 2000, Martello received a check from Santana and his law firm in the amount of $10,000.00 for her work on the medical malpractice case. Again, Martello claims that, when she called Santana to ask about the settlement amount and attorneys fees, he told her that he could not give this information to her because of another "gag order," but that "there is no need to worry, because I took care of you" [DE #1]. Martello endorsed the check as "partial payment Jeannette Martello, M.D."

      F.     Martello's "Discovery" of the Settlement Amounts

In 2005, while doing research for an article related to overcoming medical adversity, Martello tracked down the patient in the Tinker case. During the course of her conversation with him, he told her that he believed that his case had settled for around $1.75 million and that the lawyers received around $700,000.00, although there were a few lawyers other than Santana involved in the case. After this conversation, Martello located the patient in the Davis case to ask about the settlement amount in his case. He told her that he thought that the amount of the settlement was $170,000.00 and that Santana and his firm had received around $70,000.00.

A day after discovering this information, Martello contacted a lawyer, Brandon Tesser, and asked him to investigate whether she had been paid the appropriate amounts by Santana and his law firm. At Santana's request, a Confidentiality Agreement was signed by Martello, Tesser and Santana

in February 2006 [DE # 23-16]. In March 2006, Santana's attorney forwarded documentation regarding fee agreements and settlement amounts to Tesser.

Martello and Santana also entered into two tolling agreements regarding this dispute. The first, entered into in early November 2005, was signed by Martello and Santana in his individual capacity and tolled the statute of limitations for the parties' claims during the period from July 11, 2005 through January 1, 2006 [DE #23-14]. The second tolling agreement was signed by Martello and Santana, again in his individual capacity, in February 2006 and tolled the statute of limitations for the parties' claims from June 1, 2005 through April 1, 2006 [DE #23-15]. This tolling agreement further provided that the tolling period would terminate automatically on April 1, 2006, unless extended by a written agreement prior to April 1, 2006 [*Id.*]. The parties did not extend the tolling agreement beyond April 1, 2006 [DE #1].

On or around March 7, 2011, Martello filed a complaint in this Court *pro se*.[2] Martello's complaint does not state her claims in numbered paragraphs, as required by Federal Rule of Civil Procedure 10, but instead consists of 45 pages of narrative allegations, footnotes and citations of legal authority.[3] Accordingly, given the format of Martello's complaint, as well as the sheer volume of information contained therein, it is difficult to ascertain the actual claims that she purports to bring in this case. However, Martello's claims essentially break down as follows: breach of oral and written contracts to pay her contingency fees for the Howard/Lee, Davis and Tinker matters;

---

[2]Although Martello filed her complaint *pro se*, counsel entered appearances on her behalf on April 15, 2011 and continue to represent her in this matter.

[3]Although the Court is mindful that *pro se* complaints are to be held to less stringent standards than those drafted by lawyers, *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011), given Martello's significant legal training, she should have known to at least skim the requirements of the Federal Rules of Civil Procedure prior to filing her lawsuit in this Court.

fraud/fraudulent concealment of the settlement and legal fee amounts for each of these cases; and breach of fiduciary duty for defrauding Martello by failing to disclose the settlement and legal fee amounts for these cases.  Martello also alleges claims of equitable estoppel, promissory estoppel, unjust enrichment, tortious interference with contract, aiding and abetting breach of fiduciary duty, conspiracy to defraud, mail fraud and wire fraud, all of which stem from her allegations that Santana and his firm breached their agreements with Martello to pay her a contingency fee for her referral and consultation services for the Howard/Lee, Davis and Tinker matters and that Santana and his law firm defrauded Martello as to the settlement and legal fee amounts for these cases.

Accordingly, Martello's claims are all contingent upon either her ability to enforce the contingency fee agreements in the Howard/Lee, Davis and Tinker matter; the validity of her claims for fraud and fraudulent concealment in connection with the settlement and legal fee amounts for each of these cases; and/or the validity of her breach of fiduciary duty claims.  However, as set forth more fully below, the Court finds that Martello's breach of contract claims are barred, as the contracts that she seeks to enforce are void as against public policy.  Moreover, her claims sounding in fraud are barred by the applicable statute of limitations.  Finally, to the extent that Martello's complaint attempts to bring a claim for breach of fiduciary duty that is separate from her fraud claim, Martello fails to show that Santana was her fiduciary with respect to their business dealings at issue in this case.  As Martello's claims fail, her efforts to hold Santana's current law firm and/or the individual partners of that firm liable for her claims pursued in this lawsuit also fail.  Accordingly, Defendants' motion for summary judgment will be granted and Martello's complaint in this action shall be dismissed.

II.    **Analysis**

    A.    Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343. Indeed, "the nonmovant, in response to a properly made and supported motion for summary judgment, cannot rely merely on allegations but must set out specific facts showing a genuine issue for trial." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence

on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

        1.    <u>Breach of Contract Claims</u>

"The general rule of our law is freedom of contract, subject only to statute and considerations of the public interest." *Jack Henry & Associates, Inc. v. BSC Inc.*, 753 F.Supp.2d 665, 668 (E.D.Ky. 2010)(quoting *Smith v. The Ferncliff*, 306 U.S. 444, 450 (1939)). Thus, notwithstanding this "general rule," a court "may refuse to enforce contracts that violate law or public policy." *Id*. (quoting *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 42 (1987) (citations omitted)). *See also Yeager v. McLellan*, 177 S.W.3d 807, 809 (Ky. 2005)("[A] court may refuse to enforce a contract on grounds of illegality where the contract has a direct objective or purpose that violates the federal or a state Constitution, a statute, an ordinance, or the common law.")(citations omitted). Indeed, it is generally well understood that, under Kentucky law, "a contract is void ab initio if it seriously offends law or public policy." *State Farm Mut. Auto. Ins. Co. v. Newburg Chiropractic, P.S.C.*, 683 F.Supp.2d 502, 511 (W.D.Ky. 2010)(quoting *Commonwealth v. Whitworth*, 74 S.W.3d 695, 700 (Ky.2002)). In this context,

> public policy is usually understood to be the principles under which the freedom of contract and private dealing is restricted by law for the good of the community. Thus certain classes of acts are said to be against public policy and the law refuses to enforce or recognize them, on the ground that they have a mischievous tendency, so as to be injurious to the interest of the state, apart from illegality or immorality.

*Westlake Vinyls, Inc. v. Goodrich Corp.*, 518 F.Supp.2d 947, 953 (W.D.Ky. 2007)(quoting *Bankers Bond Co. v. Buckingham*, 97 S.W.2d 596, 600 (Ky. 1936)).

Here, Martello seeks to enforce purported oral and written contracts pursuant to which she would be paid a percentage of the attorneys fees recovered by Santana and his law firm, in exchange for her introduction of Santana to her patients/potential clients and for her medical legal consultation work on those patient's/client's cases. Such an arrangement is expressly prohibited by the Kentucky Rules of Professional Conduct governing the practice of law.

Supreme Court Rule 3.130(5.4) provides:

(a) A lawyer or law firm *shall not share legal fees with a nonlawyer*, except that:

(1) an agreement by a lawyer with the lawyer's firm, partner, or associate may provide for the payment of money, over a reasonable period of time after the lawyer's death, to the lawyer's estate or to one or more specified persons;

(2) a lawyer who purchases the practice of a deceased, disabled, or disappeared lawyer may, pursuant to the provisions of Rule 1.17, pay to the estate or other representative of that lawyer the agreed-upon purchase price;

(3) a lawyer or law firm may include nonlawyer employees in a compensation or retirement plan, even though the plan is based in whole or in part on a profit-sharing arrangement; and

(b) A lawyer shall not form a partnership with a nonlawyer if any of the activities of the partnership consist of the practice of law.

(c) A lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services.

(d) A lawyer shall not practice with or in the form of a professional corporation or association authorized to practice law for a profit, if:

(1) a nonlawyer owns any interest therein, except that a fiduciary representative of the estate of a lawyer may hold the stock or interest of the lawyer for a reasonable time during administration;

(2) a nonlawyer is a corporate director or officer thereof or occupies the position of similar responsibility in any form of association other than a corporation; or

13

(3) a nonlawyer has the right to direct or control the professional judgment of a lawyer.

SCR 3.130 (5.4).  The agreements at issue between Santana and Martello all provided that Martello would be paid a portion of the attorneys fees recovered by Santana and his law firm in the respective cases.  Thus, these agreements all call for the sharing of fees between a lawyer and a non-lawyer, which is clearly prohibited by Rule 5.4(a).

Martello tries in vain to re-characterize the agreements as falling within one of the exceptions to the general rule of Rule 5.4.  Martello attempts to rely on Rule 5.4(a)(3), which permits a lawyer or law firm to "include nonlawyer employees in a compensation or retirement plan, even though the plan is based in whole or in part on a profit-sharing arrangement."  SCR 3.130-5.4(a)(3).  Martello argues that she was "ostensibly employed" by Santana and his firm (although, she concedes, not as a traditional full-time employee) as a medical legal consultant for the Howard/Lee, Davis and Tinker matters.  As such, Santana and his firm were permitted to include Martello in "the compensation plans at issue in this case, which were based in whole on a profit-sharing arrangement" [DE #26 at p. 17].  However, Martello's argument ignores her own testimony that she engaged in her medical legal consulting work with Santana and his firm as a contractor, not as an employee.  Moreover, the broad interpretations of "compensation plans" and "profit-sharing arrangements" advocated by Martello would swallow the general rule prohibiting fee-splitting with non-lawyers.  Indeed, this exception seems to be directed to circumstances where an actual employee (not an "ostensible" one) is included in a law firm's compensation or retirement plan that is, itself, based in whole or in part on a profit-sharing arrangement among the lawyers of the firm (as are most law firm's compensation

14

plans).  Under Martello's interpretation of these terms, it would be difficult to conceive of a fee-splitting arrangement that did not come within the exception.

Martello's effort to rely on KBA Ethics Opinion KBA E-394 (1996) is also unavailing.  This Ethics Opinion makes clear that it is unethical for a lawyer to knowingly present testimony of an expert witness compensated on a contingent fee basis (which was not the situation here).  Ethics Opinion KBA E-394.  In addition, the Opinion further states that contracts for other litigation support services are permissible on a contingent fee basis, so long as those services do not include the presentation of expert testimony *or the splitting of legal fees with a non-lawyer*.  *Id*.  Ethics Opinion KBA E-394.  Martello argues that the Opinion "does not clarify what is meant by 'splitting of legal fees.'"  However, compensating a non-lawyer for "other litigation support services" by paying a portion of the legal fees earned for a particular case can only be considered "splitting a legal fee."

Martello also attempts to rely on *Bell Co. Bd. of Educ. v. Lee*, 39 S.W.2d 492, 493 (Ky. 1931), a case in which, according to Martello, "Kentucky's highest court approved of contingent fee arrangements for litigation support services" [DE #26 at p. 18].  However, in *Lee*, the Bell County Board of Education, not a lawyer, entered into a contract with an accountant to audit the books of certain county officers in order to ascertain whether the sheriff and county clerk had paid all moneys collected by them for school purposes to the school treasurer.  *Id*.  In exchange, the accountant was to be paid "a sum equal to 33 1/3% of all delinquent payments by the said Sheriff and Clerk, or a sum equal to 33 1/3% of any sum recovered...through litigation or compromise or otherwise," as well as on any money paid by the sheriff and clerk during and after his audit.  *Id*.  It was also agreed that, if litigation became necessary to collect the delinquencies, the accountant would testify as a witness (at his own expenses) and that the accountant and the school board would each pay one-half of all

attorney's fees. *Id*. The court found that, in this context, "the mere fact that the recovery of compensation is to be contingent upon the success of the suit is not sufficient to nullify the contract." *Id*. However, the *Lee* case did not involve splitting a contingency fee between a lawyer and a non-lawyer, but rather addressed whether a school board could hire an accountant to assist with recovering money that the board believed that it was owed by county officials. The ethics issues involved in the instant case simply were not implicated in the *Lee* case.

Similarly, in *Kentucky Bar Association v. Haas*, 985 S.W.2d 346 (Ky. 1989), another case relied upon by Martello, the Kentucky Supreme Court decided to impose reciprocal discipline on an attorney licensed in Ohio and Kentucky who had violated the Ohio legal ethics rules by entering into an arrangement with a non-lawyer insurance company salesman, whereby the salesman would refer personal injury claimants to the lawyer in return for a portion of the fees at the conclusion of the case. *Id*. at 346-347. Although the Court noted that the salesman had sued the attorney for unpaid fees and obtained a judgment (presumably in Ohio), in no way did the Court suggest that such a contract would be enforceable in Kentucky. *Id*. at 347. In addition, in determining that the attorney should also be disciplined in Kentucky for his conduct, the Court recognized that the attorney's conduct in that case "is also proscribed in SCR 3.130–5.4(a), which prohibits a lawyer from sharing legal fees with a non-lawyer; in SCR 3.130–7.20(2) which provides that a lawyer shall not give anything of value to a non-lawyer for recommending the lawyer's services, except that a lawyer may pay the reasonable cost of advertising or communication; and in SCR 3.130–5.4(c) which provides that a lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal

16

services." *Id*. Thus, the *Haas* decision actually supports Defendants' argument that the contingency fee agreements between Santana and Martello violated Kentucky's Rules of Professional Conduct.

Martello does not address whether the Howard/Lee, Davis and Tinker agreements are also unethical to the extent to which they provided that Martello would receive a contingency fee for referring her patients to Santana and his law firm. As noted above, SCR 3.130(7.20) provides, in part, as follows:

> (2) A lawyer shall not give anything of value to a non-lawyer for recommending the lawyer's services, except that a lawyer may:
>
> (a) pay the reasonable cost of advertising or communication permitted by this Rule; and,
>
> (b) pay the usual charges of a legal service plan, not to include a division of fees, operated by an organization not owned or directed by the lawyer, or,
>
> (c) pay the usual charges of a not-for-profit or qualified lawyer referral service that has been approved by the highest court in the jurisdiction where the service operates an agency designated by that court or by the Kentucky Bar Association.

SCR 3.130 (7.20). The Commentary to the Rule makes clear that, although a lawyer is allowed to pay for advertising permitted by Rule 7.20, a lawyer is not otherwise permitted to pay another person for channeling professional work. SCR 3.130 (7.20)(2009 Supreme Court Commentary, Comment 2). Here, there can be no question that a portion of the fee that Martello seeks to collect in the Howard/Lee, Davis and Tinker matters represents a fee to be paid by Santana, a lawyer, to Martello, a non-lawyer, in exchange for recommending Santana's services to Martello's patients. Such an arrangement is explicitly prohibited by the Kentucky Rules of Professional Conduct.

Notwithstanding that the purported contracts that Martello seeks to enforce are prohibited by the Kentucky Rules of Professional Conduct, Martello argues that these Rules are unlike the

17

Constitution or statutes of general application, as they are "limited to matters of attorney discipline and are not designed to create general public policy sufficient to void an attorney's contract with a non-attorney" [DE #26 at p. 19].   However, this argument fails to recognize the unique power granted to the judicial branch of government by Kentucky's Constitution.   Specifically, Kentucky's Constitution exclusively vests the judicial power of the Commonwealth of Kentucky in one Court of Justice, divided into a Supreme Court, a Court of Appeals, trial courts of general jurisdiction known as the Circuit Court and trial courts of limited jurisdiction known as District Courts, which "shall constitute a unified judicial system for operation and administration." Ky. Const. § 109.  The Kentucky Constitution further grants to the Supreme Court "the power to prescribe...rules of practice and procedure for the Court of Justice," and provides that the "Supreme Court shall, by rule, govern admission to the bar and the discipline of members of the bar."  Ky. Const. § 116.  As recognized by the Kentucky Supreme Court in *Ex parte Auditor of Public Accounts*, 609 S.W.2d 682, 685 (Ky. 1980), the references to "administration and administrative functions" do not appear in § 109 by accident.  Rather, "[t]heir purpose is to make it unmistakably clear that the judicial branch of this state government has exclusive authority to manage its own affairs."  *Id.*

Thus, to simply dismiss the Rules of Professional Conduct as unequal to statutes of general application fails to recognize that the power to regulate attorney discipline constitutionally lies solely with the Supreme Court of Kentucky.  Indeed, as explained by the Kentucky Supreme Court, "[t]he correct principle, as we view it, is that the legislative function cannot be so exercised as to interfere unreasonably with the functioning of the courts, and that any unconstitutional intrusion is per se unreasonable, unless it be determined by the court that it can and should be tolerated in a spirit of comity."  *Id*. at 688.  This Court agrees with Santana that the Kentucky Supreme Court, through its

18

rule-making powers and oversight of the Kentucky Bar Association, sets the public policy in dealings between lawyers and non-lawyers. Moreover, the Rules of Professional Conduct were not enacted solely for the benefit of the members of the bar. In *Ex parte Auditor*, the Kentucky Supreme Court explained the role of the Kentucky Bar Association and its accountability to the public as follows:

> There seems to be a rather prevalent misapprehension regarding the nature and function of the Association. It does not exist for the private benefit of the legal community. The members of the bar are entrusted with a privilege that places their duty of public service above their personal requirements and ambitions. The mission of the Association is to see to it that this trust is performed with fidelity to the high principles of their calling. This requires that the Association maintain a proper discipline of the bar, that it initiate and supervise appropriate means to insure a high standard of professional competence, and that it bear a substantial responsibility for promoting the efficiency and improvement of the judicial system itself. Without an arm such as the Association this court could not carry out its own responsibilities in those respects. As it is, the functioning of the Association in disciplinary and educational matters results in constant communication with this court and the Chief Justice in their supervisory capacities, entailing a consumption of time and effort that seems not to be realized by those not directly involved in the process.

*Id*. at 689.

Thus, although the Rules of Professional Conduct may only govern the conduct of Kentucky's lawyers, their impact is felt far beyond the members of the bar. Indeed, the Preamble to the Rules recognizes that the legal profession "has a responsibility to assure that its regulations are conceived in the public interest and not in furtherance of parochial or self-interested concerns of the bar." SCR 3.130 (Preamble)(XIII). Given that Kentucky's Constitution vests the judicial power of the Commonwealth exclusively with the Court of Justice, and specifically grants the power to regulate attorney discipline solely with the Supreme Court of Kentucky, the public policy determinations reflected by the Rules should not be any less highly regarded because they are carried out by Rules promulgated by the Supreme Court rather than statutes enacted by the Legislature.

19

This view is also consistent with the Restatement (Second) of Contracts, which provides that "[a] promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms."  Restatement (Second) of Contracts § 178.  According to the Commentary, "[t]he term 'legislation' is used here in the broadest sense to include *any fixed text enacted by a body with authority to promulgate rules*, including not only statutes, but constitutions and local ordinances, as well as administrative regulations issued pursuant to them."  *Id*. at Comment (a)(emphasis added).  Thus, the Rules of Professional Conduct enacted by the Kentucky Supreme Court would be on equal footing with statutes enacted by Kentucky's Legislature.

Martello further protests that it would be unfair to permit Defendants to void the agreements and "make a windfall profit at Martello's expense because of what they claim was *their* breach of *their* ethical obligations" [DE #26 at p. 15].[4]  She argues that finding the contingency fee agreements unenforceable only harms Martello and that she was the only party who did not violate the Rules [*Id*. at p. 16].  In a vacuum, these arguments might be appealing.  However, the Court cannot ignore the very unique circumstances of this case.  It may be true that, as Martello is not a licensed attorney, she is not bound by Kentucky's Rules of Professional Conduct.  However, it is not true that Martello entered into these agreements as a naive layman.  Rather, although not a licensed attorney, she is a well-educated doctor who was in the midst of pursuing a legal degree at a highly-regarded law

---

[4]Although this fact is not determinative, the Court notes that Martello does not dispute that she was paid for her work, albeit not as much as she believes that she was entitled.  Thus, Santana and his firm did not necessarily receive the large "windfall" as characterized by Martello.

school.  Moreover, she sat for and passed the MPRE and, accordingly, may be presumed to have had at least a basic understanding of legal ethics.  In addition, the ethical concerns regarding this arrangement were specifically drawn to her attention by Santana's March 31, 1997 letter, in which Santana informed Martello that their fee arrangement was prohibited by the Kentucky ethics rules and requested that Martello bill for her work on an hourly basis.  Indeed, it would also be unfair to permit Martello to profit by enforcing agreements that she knew were unethical.

It is also not true that Martello is not bound by *any* ethics rules.  Rather, as a licensed doctor, she has her own ethical obligations, which include refraining from fee-splitting.  The ethics guidelines issued by the American Medical Association (AMA) provide that "[a] physician may not accept payment of any kind, in any form, *from any source*...for prescribing or referring a patient to said source."  AMA, Code of Medical Ethics, Opinion 6.02 - Fee Splitting (updated June 1994), available online at:  http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code -medical-ethics/opinion602.page? (emphasis added).  According to the AMA, such payments are inappropriate as violations of the requirement to deal honestly with patients and colleagues.  *Id*. "The patient relies upon the advice of the physician on matters of referral.  All referrals and prescriptions must be based on the skill and quality of the physician to whom the patient has been referred or the quality and efficacy of the drug or product prescribed."  *Id*.  Although referrals to attorneys are not specifically mentioned in the Rule, the concerns addressed by the Rule are also implicated where a physician refers a patient to an attorney as a potential medical malpractice client.

The AMA's Code of Medical Ethics also reflects concerns about a physician obtaining a personal interest in a patient's legal or administrative proceeding.  For example, Opinion 6.01 prohibits contingent physician fees, warning that "[i]f a physician's fee for medical service is

contingent on the successful outcome of a claim, such as a malpractice or worker's compensation claim, there is the ever-present danger that the physician may become less of a healer and more of an advocate or partisan in the proceedings."  AMA, Code of Medical Ethics, Opinion 6.01 - Contingent Physician Fees (updated June 1994), available online at: http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/opini on601.page?.  Similarly, Opinion 9.07 governing medical testimony by a physician states: "All physicians must accurately represent their qualifications and must testify honestly.  Physician testimony must not be influenced by financial compensation; *for example, it is unethical for a physician to accept compensation that is contingent upon the outcome of litigation*."  AMA, Code of Medical Ethics, Opinion 9.07 - Medical Testimony (updated June 1994), available online at: http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/opini on907.page (emphasis added).  Thus, as reflected by the concerns underlying these rules, the AMA has expressed discomfort with situations where a physician's role expands beyond that of a healer or a disinterested expert and instead the physician has a personal financial interest in the outcome of litigation.[5]

    For all of these reasons, the Court finds that the purported contracts between Martello and Santana and/or his law firm, whether written or oral, pursuant to which Martello claims she was to

_____

    [5]Although Martello appears to no longer be practicing in Kentucky, the Court notes that, under KRS § 311.595, the Kentucky Board of Medical Licensure may discipline a licensee (including by revoking their license) for engaging in "dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud, or harm the public or any member thereof." KRS § 311.595(9).  Such conduct includes "[c]onduct which is calculated or has the effect of bringing the medical profession into disrepute, including but not limited to any departure from, or failure to conform to the standards of acceptable and prevailing medical practice within the Commonwealth of Kentucky, and any departure from, or failure to conform to the principles of medical ethics of the American Medical Association..."  KRS § 311.597(4).

be paid a portion of the legal fees recovered by Santana and his law firm in exchange for introducing

Santana to her patients and for her medical legal consulting work on those cases are void as against

public policy.  As explained by the Kentucky Supreme Court in *Whitworth*,

> The word "void" has a number of definitions but one of them includes the statement
> that it is useless and ineffective or lacking in legal force or validity.  *See* Webster's
> New Riverside Dictionary 1293 (2nd Ed.1998).  *Lykins v. Oaks*, 286 Ky. 332, 150
> S.W.2d 231 (1941), citing a number of older cases and legal authorities, states that
> a void contract cannot be ratified.  Black's Law Dictionary 1568 (7th Ed.1999)
> defines void as being of no legal effect; null, and further states that a contract is void
> ab initio if it seriously offends law or public policy, in contrast to a contract that is
> merely voidable at the election of one party to the contract.

*Whitworth*, 74 S.W.3d at 700.  Accordingly, the contracts that Martello seeks to enforce in this

matter are unenforceable.  Because these contracts are unenforceable, Martello's efforts to enforce

these contracts against Santana's current law firm and/or the individual partners of that firm (the

other Defendants in this matter) also fail.  Thus, Defendants' motion for summary judgment on

Martello's breach of contract claims shall be granted.

2.    <u>Martello's Fraud/Fraudulent Concealment Claims</u>

In addition to her breach of contract claims, Martello also brings claims for fraud/fraudulent

concealment in connection with Santana and his law firm's failure to disclose the settlement and

legal fee amounts in the Howard/Lee, Davis and Tinker matters.  As noted above, Martello accepted

and deposited the payment for her fees in the Howard/Lee case in June 1997.  The Davis matter was

settled during the Summer of 1999 and Santana paid Martello for her work on the case on August

2, 1999.  The Tinker cases were settled in 1998 (automobile accident case) and July 2000 (medical

malpractice case).  Martello was paid for her work on the automobile accident case in early

December 1998 and on the medical malpractice case on or around August 11, 2000.  Although she

23

claims to have first discovered that she was defrauded by Santana and his law firm and underpaid for her work on these cases around the end of May 2005, she did not file her lawsuit in this matter until March 7, 2011 [DE #1].  The parties did enter into two separate tolling agreements regarding this dispute, the first tolling the statute of limitations for the parties' claims during the period from July 11, 2005 through January 1, 2006 and the second tolling the statute of limitations for the parties' claims from June 1, 2005 through April 1, 2006.

Under Kentucky law (which the parties agree applies here), an action for relief or damages on the ground of fraud must be commenced within five years after the cause of action accrues.  KRS § 413.120(12).  Under KRS § 413.120(3), a cause of action for fraud is not deemed to have accrued until the discovery of the fraud, although the action must be commenced within 10 years after the perpetration of the fraud.  KRS § 413.130(3).  Although Kentucky law sets the length of the statute of limitations, the date that the statute of limitations begins to run is established by federal law. *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010)(citations omitted).  "Under federal law, as under most laws, the limitations clock starts ticking 'when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation.'"  *Id.* (quoting *Noble v. Chrysler Motors Corp.*, 32 F3d 997, 1000 (6th Cir. 1994)).  Similarly, under Kentucky law, the "discovery rule" provides that "a cause of action will not accrue until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, not only that he has been injured but also that his injury may have been caused by the defendant's conduct."  *Hazel v. General Motors Corp.*, 863 F.Supp. 435, 438 (W.D.Ky. 1994)(citations omitted).  Thus, under both federal and Kentucky law, the critical question is when Martello discovered, or in the exercise of

reasonable diligence should have discovered, that she had been damaged and that her damages may have been caused by Defendants.

Here, the Court finds that Martello's suspicions should have been raised regarding whether or not she was being paid her full "contingency" fee and whether or not Santana was being forthcoming regarding the settlement amounts and legal fees received by his firm beginning in at least the Spring of 1997. In Santana's March 31, 1997 letter, Santana specifically informed Martello that the "contingency fee" arrangement was unethical under Kentucky's legal ethics rules. However, Martello maintains that, notwithstanding both parties' knowledge that this compensation arrangement was unethical, they verbally agreed on a contingency fee arrangement for the Tinker case in the Fall of 1997. Moreover, with respect to her work on the Howard/Lee matter, Martello claims that, because of the ethics concerns raised by the contingency fee arrangement, Santana asked Martello to itemize her work for the case on an hourly basis, sending Martello a copy of his law firm's time records in the case in order to assist her in "reconstructing" the four years of time she had worked on the case. Martello further claims that Santana rejected her first attempt to itemize her work, asking her to prepare a version with more hours in order to justify what would have been her full $40,000.00 contingency fee. She testified that Santana "wanted it to...look like it was done on an hourly basis. He told [Martello] that it had to come out to $40,000.00" [DE #26 at p. 10].

In addition, upon receipt of payment for her work in the Davis case in August 1999 and the automobile accident portion of the Tinker case in early December 1998, Martello clearly had questions about the amounts Santana paid her for her work on those cases. When she raised those concerns with Santana, she claims that his response was that he could not disclose the settlement amount and the amount of attorneys fees received in the cases because of "gag orders," but that she

should not worry because he had "taken care of her." Despite such vague answers, Martello accepted

payment and did not look in to the matter any further. Martello claims that she did so because she

trusted Santana and had no reason to doubt him. However, she also claims that she had once seen

Santana impersonate a minister in order to gain access to the bedside of the critically ill child

involved in the Howard/Lee case, alleging that "[a]s part of his 'role' as a family minister, Santana

put on quite a production and theatrically portrayed that he was the family minister by loudly leading

the parents and other family members in prayer, with hands joined amongst them over the child" [DE

#1]. The Court is aware that Santana disputes Martello's allegations and makes no factual findings

regarding the accuracy of these allegations. Regardless, viewing the facts in the light most favorable

to Martello and accepting all of her allegations as true, as this Court must do, Martello has accused

Santana of entering into unethical contingency fee arrangements with her, despite the fact that he

warned her that such arrangements were unethical, requesting that she essentially fabricate hourly

billing statements that would justify paying her an amount equal to what she would be paid under

a contingency fee arrangement, and impersonating a minister for financial gain. According to her

complaint, Martello was aware of all of these facts when she received payment from Santana for her

work on the Tinker case in December 1998 and the Davis case in August 1999. Despite knowing

all of this information, when Martello questioned Santana regarding the adequacy of this payment,

Martello claims she was satisfied with Santana's assurances that he had "taken care of her."

However, this Court finds that, given this history and Martello's allegations regarding Santana's past

conduct, Martello should have dug deeper and made more of an effort to ascertain the settlement and

attorneys fees amounts for these cases. Thus, in the exercise of reasonable diligence, should have

discovered that she had been allegedly defrauded and underpaid with respect to her contingency fee

26

work for Santana and his law firm around the time she received payment for her work on the Davis case in August 1999, if not sooner.[6]  Thus, Martello was required to bring any claims for fraud by August 2004, if not shortly thereafter.  She did not file this lawsuit until March 2011.   Thus, Martello's fraud claims are time-barred.

However, even if Martello should not have reasonably discovered the alleged fraud by August 1999, her fraud claims would be untimely under the 10-year period for bringing fraud claims provided by KRS § 413.130(3).  In each of the cases at issue here, Martello alleges that the fraud occurred when she was underpaid for her work on the case and, when questioned, Santana failed to disclose the true settlement amounts and legal fees received for each case.  Martello was paid for her work in the Howard/Lee matter on or around June 17, 1997; in the Davis matter on August 5, 1999; and in the Tinker matter on December 3, 1998 and August 11, 2000.  Thus, these claims should have been brought by June 2007, August 2009 and December 2008, respectively.  Even assuming that Martello is correct that the tolling agreements add 10 months to the limitations period (an issue that the Court need not determine), all but perhaps her claim for the August 11, 2000 payment in the Tinker matter are untimely.  Regardless, as the Court has already determined that, had Martello acted reasonably in investigating her fraud claim, she should have discovered the alleged pattern of fraud well before she received her second payment in the Tinker matter in August 2000, this claim is still untimely.

_____

[6]In fact, the Court believes that it is entirely likely that, given the facts alleged by Martello, she should have discovered Santana's purported fraud before August 1999.  However, in an effort to view the facts in the light most favorable to Martello, the Court determines that August 1999 is the latest possible date that Martello, in the exercise of reasonable diligence, should have discovered Santana and his law firm's purported fraud.

Martello argues that the statute of limitations for her claims was tolled by Defendant's alleged fraudulent concealment of the settlement amounts and the legal fees obtained in the contingency fee cases.  Specifically, Martello relies on KRS § 413.190(2), which codifies the doctrine of fraudulent concealment, providing that:

> When a cause of action mentioned in KRS 413.090 to 413.160 accrues against a resident of this state, and he by absconding or concealing himself or by any other indirect means obstructs the prosecution of the action, the time of the continuance of the absence from the state or obstruction shall not be computed as any part of the period within which the action shall be commenced.

KRS § 419.190(2). "If a plaintiff asserts fraudulent concealment as a basis for tolling, it must plead three elements: '(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts.'" *Hoover v. Langston Equipment Associates, Inc.*, 958 F.2d 742, 745 n. 1 (6th Cir. 1992)(quoting *Dayco Corp. v. Goodyear Tire and Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975)).  In such circumstances, "[p]laintiff's ignorance of its cause of action does not by itself satisfy the requirements of due diligence and will not toll the statute."  *Hoover*, 958 F.2d at 744 (citations omitted). Rather, "[a]ny fact that should excite [the plaintiff's] suspicion is the same as actual knowledge of his entire claim."  *Friedman v. Estate of Presser*, 929 F.2d 1151, 1160 (6th Cir. 1991)(quoting *Dayco Corp.*, 523 F.2d at 394).

As noted above, by the time Martello received payment for her work on the Davis case in August 1999, multiple facts should have "excited her suspicion" about whether she was being paid her full "contingency" fee and whether or not Santana was being forthcoming regarding the settlement amounts and legal fees received by his firm.  According to Martello's complaint, Santana had entered into unethical contingency fee arrangements with her, despite warning her that such

28

arrangements were unethical, had encouraged her to essentially fabricate hourly billing statements, and had "theatrically" impersonated a minister in a hospital to gain access to the bedside of a dying child for financial gain.  Given these circumstances, her failure to investigate further to determine whether or not she had been paid what she contends she was owed when he responded to her concerns about her payment by telling her not to "worry" that he had "taken care of her" does not satisfy the requirement of due diligence.  Thus, the statute was not tolled under KRS § 413.190.

Martello further argues that, given the existence of an attorney-client relationship between Santana and Martello, he had a duty to disclose the settlement amounts and the legal fees received for each of the cases at issue and his failure to do so equals fraudulent concealment.  However, although Santana had previously represented Martello in some matters involving her former employers, as well as in a matter dealing with trade secrets for surgical anchors that involved confidentiality and possible licensing issues, this representation was unrelated to Martello's work for Santana and his law firm as a medical legal consultant.  Indeed, Martello testified that her medical legal consultation work was done as a contractor and was "separate and distinct" from her attorney-client relationship with Santana.  Accordingly, any fiduciary relationship that existed between Santana and Martello as a result of his legal representation of her in other, unrelated matters is not implicated with respect to the business relationship they had as a result of her consulting work for him and his firm.

3.    Martello's Remaining Claims

As explained previously, given the narrative format of Martello's complaint and the sheer volume of information contained therein, it is difficult to ascertain the actual claims that she purports to bring in this case.  However, Martello's complaint could be viewed as bringing claims for breach

of fiduciary duty for defrauding Martello and for aiding and abetting this breach of fiduciary duty. Under Kentucky law, "[i]n order to prevail on a claim for breach of fiduciary duty, the plaintiff must prove: (1) the defendant owes a fiduciary duty to the plaintiff; (2) the defendant breached that duty; and (3) the plaintiff suffered damages as a result of the breach." *Fastenal Co. v. Crawford*, 609 F.Supp.2d 650, 665 (E.D.Ky. 2009)(citations omitted).

To the extent that Martello's complaint could be construed as alleging a breach of fiduciary duty claim that is separate from her fraud claim, the only basis Martello alleges for the existence of a fiduciary duty is the attorney-client relationship that existed by virtue of Santana and his firm's work for her on other matters. However, as noted above, this representation was unrelated to Martello's work for Santana and his law firm as a medical legal consultant and any fiduciary relationship that existed between Santana and Martello as a result of his legal representation of her is not implicated with respect to the business relationship they had as a result of her consulting work for him and his firm. Thus, her breach of fiduciary duty claim and her related aiding and abetting breach of fiduciary claim both fail.[7]

Martello's complaint also refers to a violation of the Kentucky Rules of Professional Conduct by Santana and his law firm that she "noted" during their attorney-client relationship [DE #1 at p. 40]. However, this section of the complaint does not actually assert a claim on Martello's behalf

---

[7]Although the issue is not before the Court, the Court notes that Martello would also have a statute of limitations problem with respect to her breach of fiduciary duty claim. Kentucky's statute of limitations period for a breach of fiduciary duty claim is five years. KRS § 413.120(7). *See also Ingram v. Cates*, 74 S.W.3d 783, 787 (Ky. Ct. App. 2002). This period begins to run with the breach of duty occurs and, unlike with a fraud claim, the discovery rule is not applicable. *See Bariteau v. PNC Fin. Servs. Group*, 285 Fed.Appx. 223-224, 2008 WL 2559688 (6th Cir. July 9, 2008)(unpublished). *See also Rich & Rich Partnership v. Poetman Records USA, Inc.*, 714 F.Supp.2d 657, 668 (E.D.Ky. 2010).

concerning Santana and his firm's alleged violation of the Kentucky Rules of Professional Conduct, but rather "notes" that Santana and his firm allegedly violated "Rule 730" and "Kentucky Bar Association, Ethics Opinion KBA E-408" by soliciting the families involved in the Howard/Lee, Davis and Tinker matters without having a family or prior professional relationship with these families.[8]  Putting aside whether a private cause of action even exists for such a violation, and, if so, whether Martello would have standing to bring such a claim in these circumstances, Martello's complaint does not seek damages on account of Santana and his firm's alleged violation of this ethics rule.  Instead, rather than bringing an additional claim against Santana and his firm for violating Kentucky's Rules of Professional Conduct regarding the direct contact of potential clients, Martello appears to be simply reporting to the Court that she believes such a violation occurred. Regardless, Martello does not assert an affirmative claim based on these allegations.  Thus, there is no claim for the Court to address.

The remainder of Martello's claims - equitable estoppel, promissory estoppel, unjust enrichment, tortious interference with contract, conspiracy to defraud, mail fraud and wire fraud - are all contingent upon either her ability to enforce the contingency fee agreements in the Howard/Lee, Davis and Tinker matter; the validity of her claims for fraud and fraudulent concealment in connection with the settlement and legal fee amounts for each of these cases; and/or the validity of her breach of fiduciary duty claims.  However, as the Court has determined that

---

[8]There is no Rule 730 of the Kentucky Rules of Professional Conduct.  In addition,  KBA E-408 addresses the circumstances under which a lawyer who is also a real estate agent with a brokerage firm may provide legal representation to a client, not the solicitation rule referred to by Martello.  Presumably, Martello is intending to refer to SCR 3.130 (7.09), which governs direct contact with potential clients.

Martello's breach of contract claims and her claims sounding in fraud and breach of fiduciary duty are barred, these additional claims also fail.

Finally, Martello seeks to hold Santana's current law firm and/or the individual partners of that firm liable for her claims pursued in this lawsuit.  Although Martello's purported consulting contracts for the cases at issue here were initially made with the firm of Brown, Bucalos, Santana & Bratt, PSC, this firm dissolved on August 28, 1998.  A separate personal service corporation named "Santana Fay & Bratt, PSC" was formed with new members as of February 10, 1998.  The parties dispute whether Santana Fay & Bratt, PSC assumed the contractual rights and obligations of Brown, Bucalos, Santana & Bratt, PSC, including the alleged contracts for Martello's work on the Howard/Lee, Davis and Tinker matters.  However, as the Court finds that Martello's claims in this lawsuit fail, including her claim that these contracts are enforceable, Martello's claims against Santana's current law firm and/or the individual partners of that firm also fail.  Thus, there is no need to resolve this dispute.

### III.   Conclusion

For the foregoing reasons, and the Court being fully and sufficiently advised, it is **HEREBY ORDERED** that:

(1)   Defendants' motion for summary judgment [DE #23] is **GRANTED**, and Plaintiff's claims are **DISMISSED WITH PREJUDICE**;

(2)   Plaintiff's motion in limine [DE #24] is **DENIED AS MOOT**;

(3)   judgment in favor of Defendants will be entered contemporaneously with this Opinion & Order;

(4)   this matter is **DISMISSED** and **STRICKEN** from the active docket; and

      (5)      this is a final and appealable Order and no just cause for delay exists.

This June 15, 2012.



**Signed By:**

***Karl S. Forester*** $\mathcal{KSF}$

**United States Senior Judge**